Earl E. LANDREMAN, Richard Landerman, Eugenie H. Bodenhoff, Delores Perry, Charles G. Scully, Larry Gerondale and Gerald W. Maloch, Plaintiffs-Appellants,†

v.

Pet K. MARTIN, Joy Sundberg and Carol Ervin, Defendants-Respondents.†

Court of Appeals

*No. 94–2189. Submitted on briefs January 30, 1995.—Decided February 28, 1995.*

(Also reported in 530 N.W.2d 62.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Bronson C. La Follette* of Madison.

On behalf of the defendant-respondent, Pet K. Martin, the cause was submitted on the briefs of *Stephen J. Menard* of *Eberlein & Menard* of Shawano.

On behalf of the defendants-respondents, Joy Sundberg and Carol Ervin, the cause was submitted on the briefs of *Steven P. Means* of *Michael, Best & Friedrich* of Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.   Earl Landreman, Richard Landerman, Eugenie Bodenhoff, Delores Perry, Charles Scully, Larry Gerondale and Gerald Maloch (collectively the investors) appeal an order granting Pet Martin's, Joy Sundberg's and Carol Ervin's motions to dismiss. Landreman contends that Martin was properly served with the summons and complaint; the trial court did have personal jurisdiction over Sundberg and Ervin and that tribal sovereign immunity does not apply under the circumstances. Because we conclude that Martin was properly served, we reverse and

791

remand for further proceedings. However, we conclude that the court did not have personal jurisdiction over Ervin and, furthermore, she was immune because of tribal sovereignty. Last, we conclude that although there are disputed material facts as to Sundberg's minimum contacts with the State of Wisconsin, she is immune from this lawsuit due to tribal sovereign immunity. Thus, we affirm the trial court's motion to dismiss granted in favor of Sundberg and Ervin.

## BACKGROUND

In the fall of 1986, Pet Martin, a member of the Menominee Indian Tribe, met with Earl Landreman in Shawano, Wisconsin, to outline an investment opportunity involving construction of a bingo hall to be built on the Tsurai Tribe's trust land, Trinidad Rancheria, in Trinidad, California. Each investor was to receive 10% interest on their investment together with a percentage of the profits from the bingo hall operation.

In December 1986, Earl Landreman and Martin met with Joy Sundberg and the Tsurai Tribal Council in Trinidad. Martin and Landreman entered into an agreement with the tribe, which was the first in a series of agreements pertaining to the fundraising for the construction of the bingo hall. Martin agreed to be the general contractor for the construction and to manage it for five years in consideration of 49% of the net profit from the operation for the first five years. Landreman was named as the representative for himself and any other investors whom he might bring to the project. Another agreement ensued between Martin and Landreman outlining the conditions of the return of investments in the management of the bingo operation. The Bureau of Indian Affairs (BIA) never approved these contracts.

In October 1987, another contract was entered into in which the Tsurai Tribe employed Martin with the same duties and responsibilities specified in the previous contracts. The BIA approved this contract.

In January 1988, Sundberg traveled to Shawano. Her visit's purpose is disputed by the parties. Later, Martin and Ervin entered into the last agreement, which voluntarily terminated the terms of the October 1987 agreement. This last agreement changed Martin's compensation, eliminating the percentage of profit structure. Thus, the Wisconsin investors' percentage return, pursuant to the investment contract, was affected. Martin did pay all of the investors the principal amount of their investment and has repaid some, but not all, of the interest due per the investment contracts.

As alleged third-party beneficiaries of the contracts between Martin and the tribe, the investors brought a complaint against Sundberg and Ervin seeking to recover under a number of theories, including, tortious interference with the original contract between the tribe and Martin, breach of contract and fraud. Also, the investors brought suit against Martin for breach of contract.

Sundberg and Ervin filed a motion to dismiss pursuant to § 802.02, STATS., contending the court lacked jurisdiction due to Ervin and Sundberg's status as agents of a sovereign Indian tribe and also that they lacked minimum contacts with the State of Wisconsin. The trial court found that Sundberg and Ervin had insufficient minimum contacts with Wisconsin and were also immune as tribal chairpersons under the doctrine of sovereign immunity.

Martin moved to dismiss based on the insufficiency of process, due to Martin being served on the

Menominee Indian Reservation in violation of tribal law. Specifically, Martin was served by an officer of the Menominee County Sheriff's Department at the Menominee Tribal Casino located on the Menominee Indian Reservation. The trial court dismissed the complaint against Martin, based on defective service of process.

The investors appeal, asserting that the court obtained personal jurisdiction over Martin when she was served on the Menominee Tribal Reservation; the court had personal jurisdiction over Sundberg and Ervin pursuant to Wisconsin's long-arm statute; and tribal sovereign immunity does not apply because Sundberg and Ervin acted beyond the scope of their authority.

## SERVICE OF SUMMONS AND COMPLAINT ON TRIBAL LANDS

Martin was served by an officer of the Menominee County Sheriff's Department at the Menominee Tribal Casino, located on the Menominee Indian Reservation. We must address whether such service is defective because of tribal sovereignty. Personal jurisdiction is a question of law, which we review independently on appeal. *Marsh v. Farm Bureau Mut. Ins. Co.*, 179 Wis. 2d 42, 52, 505 N.W.2d 162, 165 (Ct. App. 1993).

There are two prongs in assessing a state's jurisdiction on Indian reservations: (1) the exercise of state jurisdiction may be preempted by federal law and (2) state jurisdiction may infringe on the rights of the tribe. *State v. Big John*, 146 Wis. 2d 741, 749, 432 N.W.2d 576, 580 (1988). State jurisdiction over Indian affairs is restricted if there is federal preemptive legis-

lation. *In re M.L.S.,* 157 Wis. 2d 26, 28-29, 458 N.W.2d 541, 542 (Ct. App. 1990). If there is no federal preemptive legislation, the second prong of the analysis is employed, which is a balancing test determining whether a state's interests in enforcing its laws outweigh tribal interests in self-government. *Id.* at 29-30, 458 N.W.2d at 542-43.

Here, the question is not one of federal preemption because the federal government has not acted in the area of personal service. *Id.* at 29, 458 N.W.2d at 542. Thus, we examine whether the state's interest in service of process procedure, balanced against the Menominee's right to self-government, is compelling. *See id.* at 30, 458 N.W.2d at 543.

In the context of service of process procedures as applied to a juvenile court proceeding, we analyzed the general question of the state's compelling interest in enforcing its service of process procedures on Menominee lands and concluded that:

> The state has a compelling interest in enforcing its service of process procedures in cases where it has subject matter jurisdiction over a Menominee Indian who is residing on the reservation. . . . All state residents, including Menominee Indians, have an interest in the state being able to obtain personal jurisdiction of matters properly before the courts of this state that involve members of the Menominee tribe.

*Id.* at 30, 458 N.W.2d at 543.

Here, Martin argues that this case is distinguishable from *M.L.S.* due to the ordinance regarding non-Menominee government officials entering tribal lands. The pertinent Menominee Ordinance, 87-15, states in its entirety:

Geographical Limitation on Activities of State and
County Law Enforcement Officials on Tribal Lands:
No law enforcement official of Menominee County
or Shawano County, Wisconsin or any other State
or governmental official, shall enter any tribal busi-
ness premises on Menominee Tribal lands within
the exterior boundaries of the Menominee Indian
Nation, for the purposes of enforcing the law of the
State of Wisconsin unless such official's presence
has been requested by "an appropriate Tribal offi-
cial". State or local law enforcement officials
discovered within the premises of a tribal business
on Menominee tribal lands acting in an official
capacity without Tribal consent, shall be escorted to
the boundaries of the Menominee Reservation and
expelled from the Reservation forthwith by the
Menominee Tribal Police. (Underline in original.)

Martin contends that the state's service of process
laws would clearly conflict with the tribe's right to self-
government as evidenced by the ordinance and its
intent and purpose.[1] Martin contends that the pres-
ence of state law enforcement officials on tribal
business property infringes on tribal members' abili-
ties to conduct business without disruption. We are not
persuaded.

Here, as in *M.L.S.*, the question involved service of
process on tribal lands. The investors brought suit

---

[1] The purpose of Menominee Ordinance 87-15 is stated as
follows: "The purpose of this ordinance is to preclude entry of
State and County law enforcement officials into Menominee
tribal businesses within the exterior boundaries of the
Menominee Nation." The intent of the ordinance outlines the
tribe's right to sovereignty of the Menominee Nation and the
appropriate role of state and county law enforcement.

against Martin alleging breach of contract.[2] The state then served Martin with the summons and complaint at a casino on Menominee land.

We conclude that the Menominee ordinance, on its face, does not prohibit such service of process. The ordinance itself does not set forth the procedure for serving a Menominee Indian on tribal lands, who is subject to the state's jurisdiction. Further, the ordinance's purpose and intent do not indicate that this ordinance is aimed at regulating service of process. Additionally, there is nothing else in the record suggesting that the Menominee tribe had its own service of process procedures in cases where the state has subject matter jurisdiction.

The presence of state law enforcement officials is not required under the Wisconsin service of process statute. Specifically, a person making service in a state action may be any adult resident of the state that is not a party to the action. Section 801.10(4)(a), STATS. If the ordinance were aimed at preventing service of process, exclusion of law enforcement officials would not accomplish that purpose.

Consequently, we conclude that the state's service of process procedure does not infringe on tribal sovereignty. As we stated in *M.L.S.*, the state has a compelling interest in maintaining personal jurisdiction over a Menominee Indian who has violated a law off the reservation, then returns to tribal lands. *Id.* at 30, 458 N.W.2d at 543.

---

[2] Martin does not dispute that the state courts have subject matter jurisdiction over this lawsuit.

## PERSONAL JURISDICTION OVER ERVIN

■

Personal jurisdiction is a question of law, which we review de novo. *Marsh,* 179 Wis. 2d at 52, 505 N.W.2d at 165. Whether Wisconsin courts have jurisdiction over a non-resident defendant is two-fold. *Id.* First, the non-resident's contacts with Wisconsin must be determined under Wisconsin's long-arm statute, § 801.05, STATS. *Id.* Second, if the long-arm statute extends to the defendant, we must determine whether the exercise of jurisdiction comports with due process requirements. *Id.* The due process clause of the Fourteenth Amendment requires that defendants must have certain minimum contacts with the state, such that the lawsuit does not offend "traditional notions of fair play and substantial justice." *Milwaukee County v. Hartford Cas. Co.,* 151 Wis. 2d 463, 471, 444 N.W.2d 455, 458 (Ct. App. 1989) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

Relying on § 801.05(5)(a) and (b), STATS., the investors assert that the long-arm statute extends to Ervin because she was involved in the last agreement between Martin and the Tsurai Tribe, in which the percentage profit structure was eliminated. The investors also allege that they are third-party beneficiaries of this contract. However, we note that Ervin never visited the State of Wisconsin. We disagree with the investor's contention and conclude that the long-arm statute does not extend to Ervin.

■

Section 801.05(5), STATS., is entitled "LOCAL SERVICES, GOODS OR CONTRACTS." Subsections (a) and (b) confer jurisdiction:

In any action which:

(a) Arises out of a promise, made anywhere to the plaintiff or to some 3rd party for the plaintiff's benefit, by the defendant to perform services within this state or to pay for services to be performed in this state by the plaintiff; or

(b) Arises out of services actually performed for the plaintiff by the defendant within this state, or services actually performed for the defendant by the plaintiff within this state if such performance within this state was authorized or ratified by the defendant.

These subsections contemplate arrangements for the performance of services within this state by either party for the other. *See* 3 JAY E. GRENIG & WALTER L. HARVEY, WISCONSIN PRACTICE, CIVIL PROCEDURE, § 105.6 (2d ed. 1994). The investors' reliance on these subsections is misplaced. All the related actions with Ervin took place in the State of California. Additionally, Ervin never visited the State of Wisconsin. Ervin's lack of any contact with Wisconsin renders the other sections of the long-arm statute inapplicable, as well.[3] Thus, we conclude that the long-arm statute does not extend to Ervin.

We need not address whether the due process clause of the Fourteenth Amendment applies, as the threshold minimum contacts requirement pursuant to Wisconsin's long-arm statute was not met.

---

[3]Ervin's actions do not fall under: (1) local presence or status; a local act or omission; or a local injury combined with a foreign act, which requires some additional contact with the state besides the foreign act and local injury. *See* 3 JAY E. GRENIG & WALTER L. HARVEY, WISCONSIN PRACTICE, CIVIL PROCEDURE, § 105.5 (2d ed. 1994); § 801.05, STATS.

## SUMMARY JUDGMENT DETERMINATION

Because matters outside the pleadings were presented on the issue of Sundberg's minimum contacts with the State of Wisconsin, we treat the motion to dismiss as a motion for summary judgment. Section 802.06(2)(b), STATS. When reviewing a grant of summary judgment, we apply the same methodology as the trial court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987).

> We first examine the complaint to determine whether a claim has been stated and then the answer to ascertain whether it presents a material issue of fact. If they do, we then examine the moving party's affidavits to determine whether a *prima facie* case for summary judgment has been made—in this case a defense which would defeat the plaintiff's claim. If it has, we look to the opposing party's affidavits to determine whether any material facts are in dispute which would entitle the opposing party to a trial. If there is no genuine issue of fact, we proceed to decide whether the moving party is entitled to judgment as a matter of law.

*Schultz v. Industrial Coils,* 125 Wis. 2d 520, 521, 373 N.W.2d 74-75 (Ct. App. 1985) (citations omitted; emphasis in original). If there are disputed issues of material fact, summary judgment is inappropriate and must be reversed so that the dispute can be resolved by a factfinder at trial. *Tomlinson v. MidAmerica Mut. Life Ins. Co.,* 168 Wis. 2d 92, 95-96, 483 N.W.2d 234, 236 (Ct. App. 1992).

In her affidavit, Sundberg maintains that when she traveled to Shawano in January 1988, she met with several individuals who had invested money with Mar-

tin. However, she also asserts that she stayed with a personal friend, shopping and socializing. She contends that she did not solicit investments from any Wisconsin residents at that time. On the other hand, Landreman's affidavit asserts that Sundberg traveled to Shawano with the purpose of meeting with the Wisconsin investors, and that she did, in fact, conduct an investor's meeting. Viewing these disputed material facts against the moving party, Sundberg, we conclude that the purpose of Sundberg's Wisconsin visit is material, pertaining to her minimum contacts with Wisconsin. Hence, we conclude that the trial court prematurely granted dismissal on this issue without first resolving this factual dispute. However, because of our holding on sovereign immunity, we need not remand to resolve the factual dispute on Sundberg's contacts with the state.

## SOVEREIGN IMMUNITY

Generally, Indian tribes enjoy sovereign immunity from lawsuits similar to immunity of the United States government. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978). An Indian tribe cannot be sued without the consent of the tribe or of Congress. *Id.* However, sovereign immunity applies to the tribe itself, not the individual members of the tribe. *Puyallup Tribe v. Department of Game,* 433 U.S. 165, 171-72 (1977). Tribal officers, however, do share the tribe's immunity if their actions are within the scope of their representative capacity. *Davids v. Coyhis,* 869 F. Supp. 1401, 1409 (E.D. Wis. 1994) (citing *Burlington Northern R.R. v. Blackfeet Tribe,* 924 F.2d 899, 901 (9th Cir. 1991)).

The trial court granted the motion to dismiss in favor of Sundberg and Ervin, basing its decision on

sovereign immunity because they were acting within the scope of their authority as tribal officers. The investors allege that Sundberg and Ervin acted outside of the scope of their authority. However, this assertion is not fully developed in their affidavit. On the other hand, Sundberg and Ervin declare that they were tribal officers of the Trinidad Rancheria acting within their scope of authority when contracting for the bingo hall project and thus enjoy sovereign immunity from the breach of contract lawsuit.

Because matters outside the pleadings were considered on the issue of Ervin and Sundberg's scope of authority, we treat the motion to dismiss as a motion for summary judgment. *See* § 802.06(2)(b), STATS. When reviewing a grant of summary judgment, appellate courts independently apply the same methodology as the trial court. *Kloes v. Eau Claire Cavalier Baseball Ass'n*, 170 Wis. 2d 77, 83, 487 N.W.2d 77, 79-80 (Ct. App. 1992). That methodology has been set forth above. Any reasonable doubt as to the existence of disputed material fact is resolved against the moving party. *Heck & Paetow Claim Serv. v. Heck*, 93 Wis. 2d 349, 356, 286 N.W.2d 831, 834 (1980).

It is undisputed from the contracts involved that Ervin and Sundberg were indeed chairpersons of the Trinidad Rancheria with their names and titles on the various agreements made with Martin. Further, it is evident that when contracting for investors of the bingo hall, Sundberg and Ervin were acting for the tribe's purpose. There is no claim in opposition to summary judgment that Sundberg and Ervin benefitted personally from the agreements made. Even assuming that the investors' allegations of false representation and

fraud are true, Sundberg and Ervin are still protected by sovereign immunity. The dispositive element in our analysis is that their actions were not for their own personal interest or economic gain, but for the tribe's benefit.

This conclusion is consistent with the federal government's long-standing policy promoting tribal self-determination and government. *See Three Affiliated Tribes v. Wold Eng'g,* 476 U.S. 877, 890 (1986). The United States Supreme Court recognizes a deeply rooted policy of allowing Indians to be free from state jurisdiction and control. *McClanahan v. State Tax Comm'n,* 411 U.S. 164, 168 (1973). This policy is also evidenced by federal legislation affecting Indians.[4] Further, sovereign immunity of governmental officers is supported by the theory that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Barr v. Matteo,* 360 U.S. 564, 572 (1959).

We note that unfairness may result from the sovereign immunity of Indian tribes and tribal officials acting within the scope of their authority. *Cf. C.L. v. Olson,* 143 Wis. 2d 701, 709, 422 N.W.2d 614, 616 (1988) (official immunity comes at a great cost). We also recognize that tribal sovereign immunity may very well be a barrier to economic development of tribal interests, due to the unavailability of redress in potential contractual disputes. However, long-standing

---

[4] Legislative intent reflected in areas of Indian law indicates the government's promotion of tribal autonomy and self-government, supporting sovereign immunity. *See, e.g.,* INDIAN CIVIL RIGHTS ACT OF 1968, 25 U.S.C.A. §§ 1301-1303 (1992); INDIAN SELF-DETERMINATION AND EDUCATION ASSISTANCE ACT OF 1975, 25 U.S.C.A. §§ 4501-450n (1992).

policy dictates the promotion of tribal self-government and, consequently, sovereign immunity.

In sum, we conclude that Martin was properly served with process on Menominee tribal land, due to the tribe's lack of its own service of process procedure, thus the state's service of process procedure does not infringe on tribal sovereignty. Second, Wisconsin's long-arm statute does not extend to Ervin and she is protected by the tribe's sovereign immunity. Last, although there are disputed material facts as to Sundberg's contacts with the State of Wisconsin, she is also immune from this lawsuit because she is protected by tribal sovereign immunity.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings. Costs awarded to Sundberg and Ervin.