Rivera, J.
(dissenting). The question on this appeal is whether a corporate subsidiary of a corporation owned and controlled by an Indian Tribe, and which exists solely for the economic benefit of the Tribe and its members, is immune from private suit based on the Tribe’s sovereign immunity. I can find no rational legal basis to distinguish between the corporate parent, which is a recognized arm of the Tribe, and its subsidiary. Therefore, I would find the subsidiary is immune from suit.
L
The Seneca Nation of Indians (the Nation) is a sovereign Tribe, predating the creation of the United States, with its own government, laws and cultural identity (see Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 79 Fed Reg 4748-02 [2014]; Seneca Nation of Indians v State of New York, 26 F Supp 2d 555, 560 [WD NY 1998], affd 178 F3d 95 [2d Cir 1999]). As a tribal sovereign it provides its members with various health and *553 education-related services and programs, which are dependent on the Nation’s financial stability and well-being. The Nation has identified the gaming industry as “vitally important to the economy of the Nation and the general welfare of its members” (Seneca Gaming Corporate Charter Law Enactment, Council of the Seneca Nation of Indians, Aug. 1, 2002). As part of its economic development activities it has created and chartered, under the Nation’s corporate charter, three interlocking corporate entities, intended to further the Nation’s gaming operations, all for the benefit of its members.
The Nation created the Seneca Gaming Corporation (Seneca Gaming) to “finance, develop, construct, operate, and maintain Nation Gaming Facilities.” The Nation then created the Seneca Niagara Falls Gaming Corporation (Seneca Niagara Falls Gaming) as a subsidiary of Seneca Gaming, for purposes of “developing, financing, operating and conducting the business of the Nation Gaming Facility” on Nation territory located in Niagara County, New York.[1] Seneca Niagara Falls Gaming is subject to the “control, operation and management” of Seneca Gaming.
The Nation decided to capitalize on the subsequent success of its gaming operations, and Seneca Niagara Falls Gaming commenced development of a golf course in the Town of Lewiston, New York in Niagara County. The Nation thereafter created the Lewiston Golf Course Corporation (Lewiston Golf) “as a separate legal entity, governmental instrumentality of the Nation, and wholly-owned subsidiary of [Seneca Niagara Falls Gaming], for the purpose of developing and operating the Lewiston Golf Course.”
All three of the Nation’s resolutions creating Seneca Gaming, Seneca Niagara Falls Gaming, and Lewiston Golf, and their respective corporate charters provide:
“it is declared the policy of the Nation to promote the welfare and prosperity of its members and to actively promote, attract, encourage and develop economically sound commerce and industry through governmental action for the purpose of preventing unemployment and economic stagnation; and . . .
“the economic success of the Nation’s gaming operations is vitally important to the economy of the Nation and the general welfare of its members.”
*554 Plaintiff Sue/Perior Concrete & Paving, Inc., a contracting company who had previously done business with the Nation, entered a contract with Lewiston Golf to construct the golf course. After certain payment disputes, plaintiff filed a mechanic’s lien foreclosure action against Lewiston Golf in Niagara County. Plaintiff also filed an action in Erie County against several of the same defendants, with the exception of Lewiston Golf, but Erie County Supreme Court dismissed that action based on the sovereign immunity of Seneca Gaming and Seneca Niagara Falls Gaming.
Lewiston Golf moved to dismiss the action, asserting sovereign immunity against suit as an arm of the Nation. Supreme Court and the Appellate Division both rejected this contention, and held that Lewiston Golf is not an arm of the Nation. The majority now agrees, and based on Matter of Ransom v St. Regis Mohawk Educ. & Community Fund (86 NY2d 553 [1995]) concludes that because Lewiston Golf is without power to bind or obligate the Nation’s funds it lacks a sufficient financial relationship with the Nation to entitle it to sovereign immunity.
I disagree with the majority that certain financial factors identified by this Court in Ransom, and as applied here, should be treated as outcome determinative of the question of the expanse of the Nation’s sovereign immunity over its corporate subsidiary Lewiston Golf. Instead, our focus should be the purpose and corporate structure of Lewiston Golf. As a corporate entity created and chartered by the Nation, established to enhance the Nation’s gaming operations for the purpose of benefitting the Nation’s members, I would hold Lewiston Golf is clothed with the Nation’s sovereign immunity.
IL
Tribes are “ ‘separate sovereigns pre-existing the [United States] Constitution’ ” (Michigan v Bay Mills Indian Community, 572 US —, —, 134 S Ct 2024, 2030 [2014], quoting Santa Clara Pueblo v Martinez, 436 US 49, 56 [1978]), and possess “ ‘common-law immunity from suit traditionally enjoyed by sovereign powers’ ” (id., quoting Santa Clara Pueblo, 436 US at 58). Indeed, “sovereign immunity [is] an inherent part of the concept of sovereignty and what it means to be a sovereign” (Breakthrough Mgt. Group, Inc. v Chukchansi Gold Casino & Resort, 629 F3d 1173, 1182 [10th Cir 2010]), and “is ‘a necessary corollary to Indian . . . self-governance’ ” (Bay Mills Indian Community, 572 US at —, 134 S Ct at 2030, quoting *555 Three Affiliated Tribes of Fort Berthold Reservation v Wold Engineering, P. C., 476 US 877, 890 [1986], and citing Hamilton, Federalist No. 81 at 511 [Benjamin Fletcher Wright ed 1961] [It is “inherent in the nature of sovereignty not to be amenable” to suit without consent]). Sovereign immunity serves interests essential to tribal identity, and is fundamental to the survival and growth of tribes and their members. Moreover, immunity is “ ‘necessary to promote the federal policies of tribal self[-] determination, economic development, and cultural autonomy’ ” (Breakthrough Mgt. Group, Inc., 629 F3d at 1182 [modification in original], quoting American Indian Agric. Credit Consortium, Inc. v Standing Rock Sioux Tribe, 780 F2d 1374, 1378 [8th Cir 1985]).
The United States Supreme Court has broadly applied tribal sovereign immunity to extend to “suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off” Indian lands (Kiowa Tribe of Okla. v Manufacturing Technologies, Inc., 523 US 751, 760 [1998]; see also Bay Mills Indian Community, 572 US at —, 134 S Ct at 2030-2031). There are no exemptions for tribal commercial activity (see Cayuga Indian Nation of N.Y. v Seneca County, N.Y., 761 F3d 218, 221 [2d Cir 2014]), and, thus, sovereign immunity extends to tribal business ventures (Oklahoma Tax Comm’n v Citizen Band of Potawatomi Tribe of Okla., 498 US 505, 510 [1991]). Immunity may be limited only by Congress or express waiver of a tribe (Kiowa, 523 US at 754).
Unsurprisingly, “tribes across the country, as well as entities and individuals doing business with them, have for many years relied on [Supreme Court precedent], negotiating their contracts and structuring their transactions against a backdrop of tribal immunity” (Bay Mills Indian Community, 572 US at —, 134 S Ct at 2036, referencing Kiowa, 523 US 751). Over the years tribal activities have grown, “tribal gaming revenues [have] increased more than thirty fold,” and “other tribal enterprises, ranging from cigarette sales to ski resorts” have flourished (Bay Mills Indian Community, 572 US at —, 134 S Ct at 2037; see 572 US at —, 134 S Ct at 2050-2051 [Thomas, J., dissenting]). “[T]ribal business operations are critical to the goals of tribal self-sufficiency because such enterprises in some cases ‘may be the only means by which a tribe can raise revenues.’ This is due in large part to the insuperable (and often state-imposed) barriers Tribes face in raising revenue through more traditional means” (572 US at —, 134 S Ct at 2043 [Sotomayor, J., concurring] [citation omitted]).
*556 IIL
As federal courts have held, the Seneca Nation of Indians has immunity from suit based on its status as a sovereign Indian Nation (Seneca Nation of Indians, 178 F3d 95) and that Seneca Niagara Falls Gaming and Seneca Gaming are arms of the Nation (Warren v United States, 859 F Supp 2d 522, 540-541 [WD NY 2012], affd 517 Fed Appx 54 [2d Cir 2013]; Myers v Seneca Niagara Casino, 488 F Supp 2d 166 [ND NY 2006]) fully clothed with the Nation’s sovereign immunity. The question of whether Lewiston Golf, another subentity of the Nation, may assert sovereign immunity then seems a rather straightforward one, and one which should be decided in Lewiston Golfs favor.
Tribal sovereignty, including immunity from suit, “is subject to the superior and plenary control of Congress [and] without congressional authorization, the Indian Nations are exempt from suit” (Santa Clara Pueblo, 436 US at 58 [internal quotation marks and citation omitted]). As such, tribal immunity is “a matter of federal law and is not subject to diminution by the States” (Kiowa, 523 US at 756). The Nation is a sovereign with its own government and rights to self-determination, and as such empowered to determine how best to structure its business ventures. Therefore, we are without authority, absent congressional limitation, to reject the Nation’s adoption of a corporate structure that furthers its economic development goals.
The majority relies on this Court’s decision in Ransom for the legal framework by which to decide Lewiston Golfs sovereign immunity. However, Ransom was decided before the United States Supreme Court announced its decisions in Kiowa and Bay Mills Indian Community recognizing sovereign immunity applied broadly to Indian business ventures, even those outside Indian lands. Therefore, the factors in Ransom cannot supercede federal proscriptions, and we must be cautious not to rely on these factors in a way that conflicts with federal law.
The record makes abundantly clear that the Nation created Lewiston Golf as a commercial business venture to increase the Nation’s gaming revenues for the benefit of the Tribe and its members. The Nation determined that the best way to pursue this goal is through a corporate structure whereby Lewiston Golf is controlled by the Nation’s corporate entity. As a sovereign, the Nation is certainly able to decide that this corporate arrangement will enhance its economic independence and sustain its tribal membership and self-sustaining tribal *557 government. The Nation, having made that choice, is no less entitled to expect that the protections afforded by its sovereign immunity will apply equally to the activities of Lewiston Golf as it does to the activities of Seneca Gaming and Seneca Niagara Falls Gaming.
The logic of treating uniformly the corporate entities for sovereign immunity purposes is illustrated by comparing Lewiston Golf and Seneca Niagara Falls Gaming. As their respective corporate charters reveal, Seneca Niagara Falls Gaming and Lewiston Golf are strikingly similar, both are owned by an arm of the Nation (Seneca Gaming in the case of Seneca Niagara Falls Gaming, and Seneca Niagara Falls Gaming in the case of Lewiston Golf), and both are controlled and run by the Nation. Both seek to increase the Nation’s revenue, with the obvious difference that Seneca Niagara Falls Gaming was created for the “purpose of developing, constructing, owning, leasing, operating, managing, maintaining, promoting and financing a Nation Gaming Facility on Nation territory within the exterior boundaries of Niagara County pursuant to the terms of the [gaming] Compact,” and Lewiston Golfs purpose is to “develop[ ], construct [ ], own[ ], leas[e], operat[e], manag[e], maintain [ ], promot[e] and financ[e] the Lewiston Golf Course on land” which at the time of Lewiston Golf’s creation was owned by Seneca Niagara Falls Gaming. Thus, one exists to maintain a casino for the Nation’s benefit, the other exists to maintain a golf course to enhance casino revenues for the Nation’s benefit. Both improve the Nation’s economic position. Moreover, not only are they similar in purpose and service to the Nation and its members, but Lewiston Golf is intended as an amenity to the casino to “further[ ] . . . the economic success of the Nation’s gaming operations.” The point of both business enterprises is to bring revenues to the Nation.[2] If the golf course was owned by Seneca Niagara Falls Gaming, a recognized arm of the Nation, there would be no question that sovereign immunity would foreclose plaintiff’s suit against Lewiston Golf. Consequently, there is no logical basis to treat Lewiston Golf differently simply because it is a subsidiary of Seneca Niagara Falls Gaming.
*558 Therefore, I can find no legally defensible ground for rejecting sovereign immunity to Lewiston Golf, a corporate entity that is established under the Nation’s laws and constitution, chartered by the Nation to develop, construct and operate a golf course in furtherance of the Nation’s existing gaming operations, and, consistent with the Seneca Niagara Falls Gaming charter, controlled by Nation officials who make all significant business decisions. Like its parent Seneca Niagara Falls Gaming, Lewiston Golf is an engine for tribal economic development and growth.
The majority claims that there is no legal support for presuming Seneca Gaming and Seneca Niagara Falls Gaming’s sovereign immunity. However, in Warren the district court, as affirmed by the Second Circuit, held that Seneca Gaming “is a government instrumentality entitled to immunity” (859 F Supp 2d at 541), finding specifically that Seneca Gaming
“is incorporated under Seneca tribal law; it was created to generate income to provide for the general welfare of [the Nation’s] members; a majority of the board of directors are enrolled Senecas; [Seneca Gaming’s] principal place of business is on the Cattaraugus reservation; all important corporate acts require approval of the tribal Council; [and] the tribal Council may remove [Seneca Gaming] board members for cause” (id.).
In Myers, the district court stated that Seneca Niagara Falls Gaming “enjoys all of the privileges and immunities of the Nation” (Myers v Seneca Niagara Casino, 488 F Supp 2d at 167-168 n 2). Thus, it is undisputed that under federal law these entities are entitled to the Nation’s sovereign immunity.
Nevertheless, the majority casts these decisions to the wind, and asserts that in the instant appeal it may ignore federal precedent and place in question sovereign immunity as it applies to the Seneca Gaming and Seneca Niagara Falls Gaming, and a fortiori Lewiston Golf (majority op at 551). According to the majority, it is free to apply outdated decisions, propound unfounded conclusions, and clear its own path on the question of sovereign immunity until such time as the United States Supreme Court speaks on the issue. Well the Supreme Court has spoken, and we are bound to comply with its pronouncement that tribal sovereign immunity is a federal matter “not subject to diminution by the States” (Kiowa, 523 US at 756). Thus, our Court is without authority to render tribal commercial activities *559 meaningless by subjecting tribal entities to suit in contravention of federally recognized immunity. Consequently, with respect to Seneca Gaming and Seneca Niagara Falls Gaming the law is currently settled in New York that they are arms of the Nation and clothed with sovereign immunity.[3]
Implicit in the majority’s argument for rejecting Lewiston Golf’s claim is the notion that the corporate form, and the protections therein, categorically bars the extension of sovereign immunity. This is simply an irrelevant consideration because the sovereign immunity of a tribe extends to its subordinate economic entities (see e.g. Native Am. Distrib. v Seneca-Cayuga Tobacco Co., 546 F3d 1288 [10th Cir 2008] [tobacco manufacturer]), including corporate entities (see e.g. Memphis Biofuels, LLC v Chickasaw Nation Indus., Inc., 585 F3d 917, 921 [6th Cir 2009] [tribal conglomerate was an arm of the Tribe; incorporating under 25 USC § 477, i.e., a section 17 corporation, did not automatically waive tribal sovereign immunity]; Koscielak v Stockbridge-Munsee Community, 340 Wis 2d 409, 418, 811 NW2d 451, 456 [2012] [golf course and supper club], review granted 342 Wis 2d 155, 816 NW2d 321 [2012]).
The majority rests its decision on Lewiston Golfs apparent inability to bind or obligate the funds of the Seneca Nation. As noted above, the financial and administrative duties and obligations of Lewiston Golf the Seneca Nation are nearly identical to those of Seneca Niagara Falls Gaming. According to their charters, neither can bind nor obligate the funds of the Seneca Nation. Yet, Seneca Niagara Falls Gaming is an arm of the Tribe (see Sue/Perior Concrete & Paving, Inc. v Seneca Gaming Corp., 99 AD3d 1203 [4th Dept 2012]; Seneca Niagara Falls Gaming Corp. v Klewin Bldg. Co., Inc., 2005 WL 3510348, *5, 2005 Conn Super LEXIS 3295, *14 [Nov. 30, 2005, No. KNL-CV-05-4004218-S] [Seneca Niagara Falls Gaming, which is a wholly-owned subsidiary of Seneca Gaming is a governmental instrumentality of the Seneca Nation]; Warren, 859 F Supp 2d at 540-541 [Seneca Gaming entitled to immunity; finding Seneca *560 Gaming charter provisions incorporated in all relevant respects into the Seneca Niagara Falls Gaming charter], citing Klewin Bldg. Co., Inc., 2005 WL 3510348, *5, 2005 Conn Super LEXIS 3295, *12-14; Myers, 488 F Supp 2d at 167-168 n 2).
In deciding the expanse of sovereign immunity, our focus should be on the purpose and goals of the corporate entity. We should look to whether the corporate entity furthers tribal self-determination and self-governance, and as such, benefits the tribe’s members. Therefore, I would not rely primarily on Ransom’s financial interconnectedness factors. Indeed, federal and state courts have criticized the multi-factor approach to subordinate economic analysis as contravening Kiowa (see Kiowa, 523 US at 754-755; Breakthrough Mgt. Group, Inc., 629 F3d at 1185-1189 [expressly overruling district court’s holding that financial interconnectedness is a threshold factor]; Cash Advance & Preferred Cash Loans v State, 242 P3d 1099, 1110 n 12 [Colo 2010] [distinguishing Ransom as pre-KiowaJ). Moreover, Runyon, also a pre-Kiowa case, was an expressly narrow ruling, which relied on Ransom and Alaska corporate law (Runyon v Association of Vil. Council Presidents, 84 P3d 437, 441 [Alaska Sup Ct 2004], citing Alaska Stat § 10.20.051 [b]).
IV
Plaintiff argues that even if Lewiston Golf is entitled to sovereign immunity, that immunity has been waived and thus it is subject to suit. I can find no basis in law or the record to support waiver. As the United States Supreme Court has made clear, “an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity” (Kiowa, 523 US at 754). Just this past term, in Michigan v Bay Mills Indian Community, the Supreme Court reaffirmed, not only that it is for Congress “to abrogate tribal immunity for off-reservation commercial conduct,” but that Congress has chosen not to do so (572 US at —, 134 S Ct at 2031).
As the court in Ransom recognized, “preserving tribal resources and tribal autonomy are matters of vital importance” and waiver of “sovereign immunity cannot be implied but must be unequivocally expressed” (Ransom, 86 NY2d at 560-561 [internal quotation marks omitted], quoting Santa Clara Pueblo, 436 US at 58). “[W]aivers . . . are . . . strictly construed in favor of the Tribe” (Ransom, 86 NY2d at 561 [internal quotation marks omitted], quoting Rupp v Omaha Indian Tribe, 45 F3d 1241, 1245 [8th Cir 1995]).
*561 Plaintiff’s contract with Lewiston Golf lacks any express waiver of sovereign immunity. Plaintiff seeks to avoid sovereign immunity arguing that Lewiston Golf is subject to suit for the mechanic’s lien foreclosure. However, courts have failed to recognize the distinction between in rem and in personum jurisdiction asserted by the respondent (see Cayuga Indian Nation of N.Y., 761 F3d 218, 220; Oneida Indian Nation of N.Y. v Madison County, Oneida County, N.Y., 605 F3d 149, 159 [2d Cir 2010], vacated on other grounds and remanded 562 US 42 [2011]). Regardless, the suit ultimately seeks to enforce Lewiston Golfs alleged debt to the plaintiff, and does not seek title to the land, so even plaintiffs in rem theory must fail.
I would reverse the Appellate Division because Lewiston Golf is entitled to sovereign immunity, therefore I dissent.
Judges Graffeo, Smith and Abdus-Salaam concur; Judge Rivera dissents in an opinion in which Chief Judge Lippman and Judge Read concur.
Order affirmed, with costs, and certified question answered in the affirmative.

. The Nation Gaming Facility operates in accordance with the Indian Gaming Regulatory Act and the Compact between the Nation and New York State.

. There is certainly nothing unique in establishing a golf course as an economic development venture. As Lewiston Golf points out, New York has several public golf courses that are public amenities that “create jobs and support economic development.”

. Realizing that it cannot avoid federal law, the majority opines that perhaps Lewiston Golf is different from the other Seneca corporate entities because the purposes of Seneca Gaming and Seneca Niagara Falls Gaming are more aligned with those of the Nation (majority op at 552). The record belies any such distinction. Indeed, the corporate charters are quite clear that the purpose of these three entities is to benefit the Nation and its members through “governmental action for the purpose of preventing unemployment and economic stagnation,” achieved through the economic success of the Nation’s gaming operations.